IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

TAYLOR SHARYN KING                                           PLAINTIFF

v.                                           CIVIL ACTION NO. 1:24-cv-197-SA-DAS

LEGACY HOSPICE OF THE SOUTH
d/b/a MERCY HOSPICE, LLC                                     DEFENDANT

ORDER AND MEMORANDUM OPINION

On October 30, 2024, Taylor Sharyn King initiated this civil action by filing her Complaint [1] against Legacy Hospice of the South d/b/a Mercy Hospice ("Legacy"). The Complaint [1] brings claims for failure to accommodate under the Pregnant Workers Fairness Act ("PWFA") and sex discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act. Before the Court is Legacy's Motion for Summary Judgment [29]. The Motion [29] has been fully briefed and is ripe for review. Having considered the parties' filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Factual Background*

This lawsuit arises from the termination of King's employment with Legacy after her physician placed her on medical restrictions related to pregnancy.

King is a registered nurse who, in October 2023, began working for Legacy as a case manager at its Starkville, Mississippi branch. Legacy is a hospice services provider that services the following Mississippi counties through its Starkville office: Webster, Clay, Choctaw, Oktibbeha, Lowndes, Winston and Noxubee. Legacy's services include providing care to patients either in the patients' homes, nursing facilities, or residential/assisted living facilities where the patient may be housed.

As a case manager, King's job duties included traveling to her assigned patients to provide them with professional nursing care. Case managers at Legacy each have a designated geographic work area, so King's patients were assigned to her based on the patients' geographical location. Additionally, Legacy's case managers are subject to an "on-call" schedule, which changes daily and occasionally requires the on-call case manager to see patients assigned to another case manager. Among others, one qualification listed in Legacy's job description for case managers is the ability to "… lift, position and/or transfer patients." [29], Ex. 5 at p. 2.

During her employment with Legacy, King reported to Legacy's Starkville Branch Administrator, Railey Greene, according to the summary of her job description. However, King's direct supervisor was Brandy Wyatt, a Patient Care Coordinator ("PCC") at the Starkville branch.

On January 23, 2024, King learned that she was pregnant. At her deposition, she testified that the following week she informed Wyatt and Greene of her pregnancy and that she would have more doctor's visits in the future. Given her history of previous miscarriages, King told Wyatt and Greene that she would have "… more OB-GYN visits than most people." [33], Ex. 1 at p. 23. King's estimated due date was September 29, 2024.

On February 21, 2024, King received a restriction letter from her physician recommending, among other things, that she not lift more than 35 pounds. The parties dispute whether Legacy was aware of the restrictions by virtue of the February letter. At her deposition, King testified that she informed Wyatt and Greene of the restrictions and provided them with a copy of the letter; however, she could not recall whether she had emailed it to them or sent them a picture. For her part, Greene testified at her deposition that she had "never seen" the February 2024 restriction letter. *Id.*, Ex. 6 at p. 10. As for Wyatt, she is no longer employed by Legacy and was not deposed in this case.

2

One month later, on March 20, 2024, King contacted Marina Kazanjian, Legacy's Human Resources Generalist, via email regarding her pregnancy. Specifically, in the email, King informed Kazanjian of her high-risk pregnancy, her expected due date, and her plans to work until her delivery date if no complications arose. The email also stated, in pertinent part: "I [King] have a letter of restrictions from my OBGYN provided [sic] that I will give to our office manager to place in my file." *Id.*, Ex. 9 at p. 1. The email did not include the February restriction letter as an attachment.

Thereafter, King received a second restriction letter from her physician on April 17, 2024. The April letter recommended that King lift no more than 25 pounds, that she not work over 40 hours per week, and that she be allowed to take frequent bathroom breaks and elevate her legs as necessary.

On May 1, 2024, Kazanjian sent an email to King asking for an update on her medical restrictions. King responded by providing a copy of the April restriction letter and the following update of her pregnancy status:

> Hey! I am doing okay so far! I will attach my restrictions letter. My provider has let me know that at 32 weeks I will need to be on light duty which is August 1st to prevent further complications. What does that normally entail? Our patient loads are extremely heavy right now which has caused some trouble for me health wise but I am managing the best I can at this time. Please let me know how y'all normally handle this! I have made [Brandy], PCC and Railey, BA aware but I was told yesterday to reach out to you for guidance! Also Morrison is my maiden name on the letter!

[33], Ex. 8 at p. 1.

Following this email exchange, Kazanjian and Greene discussed King's restrictions via a Teams call. Kazanjian testified that Greene "… stated that due to these restrictions that it was not possible for Taylor King to do her job." *Id.*, Ex. 5 at p. 8. Thereafter, a meeting was held on May

3

16, 2024. Present at this meeting were King, Kelsey Hisaw (a PCC at Legacy at that time), Greene, and Kazanjian, who participated in the meeting remotely via Facetime.[1]

During the meeting, Kazanjian expressed concern for King's 25-pound lifting restriction and her ability to perform her nursing duties. After some discussion, she then asked King "… So because of your current medical condition, you're unable to perform your duties. Would you agree or disagree?" *Id.*, Ex. 1 at p. 52. In response, King indicated that she had been managing her job duties well so far and had been coordinating for the CNA (certified nurse assistant) assigned to her patients to be present at the same time she provided nursing care. She referred to this arrangement as "buddy visits." *Id*. King testified that she had coordinated buddy visits for two patients after she received the February restriction letter, one of which she described as combative. After King received the April restriction letter, she continued to arrange the buddy visits with the CNAs for patients who required turning or holding for wound care. One of the CNAs with whom King arranged the buddy visits was Tameika Williams.

At the meeting, Kazanjian asked Greene if King could continue arranging buddy visits with the CNAs, and Greene "… stated that she could not meet those accommodations." *Id.*, Ex. 5 at p. 12. According to Greene, Legacy "… could not guarantee that there was somebody with [King] every time she saw a patient." *Id.*, Ex. 6 at p. 18. Greene also testified that she was unaware that King had been arranging the buddy visits until Kazanjian informed her. However, at her deposition, King testified that Brandy was "for sure" aware of the buddy visits, and she thought that Riley was aware also. *Id.*, Ex. 1 at p. 107.

---

[1] The Court notes that King recorded the discussions that took place during the May 16, 2024 meeting with her cell phone after disclosing to those present at the meeting that she intended to do so. That audio recording has not been made part of the record in this case. In light of an evidentiary issue surrounding a transcript of the recording, which the Court will address hereinafter, the Court has relied on the sworn testimony of witnesses in construing this recitation of facts.

During the May meeting, King inquired with Kazanjian and Greene about working "in the office" at Legacy, but "they said no." *Id.*, Ex. 1 at p. 64. There was a vacant scheduling coordinator position available at Legacy during the relevant time though King did not recall formally asking about that specific position. When asked about this vacant position, Clay Jones, Chief People Officer of Legacy, testified that "[he] wouldn't put an employee that has misused the scheduling system for the last two and a half weeks for hire into a scheduling role." *Id.*, Ex. 2 at p. 32.

Legacy terminated King at the May 16, 2024 meeting. It alleges that it terminated King because it "… could not accommodate King's medical restrictions, and she was not eligible for medical leave." [30] at p. 8. More specifically, Legacy alleges it could not accommodate King's 25-pound lifting restriction because it was an integral aspect of her job as a case manager. Though Jones was not present at the termination meeting, he made the termination decision in conjunction with Kazanjian. Kazanjian recommended King's termination based on Greene's assessment. Approximately three months later, Jessica Griffin was hired to fill King's position.

On May 22, 2024, King filed an EEOC charge against Legacy. The instant lawsuit followed.

King brings claims against Legacy for failure to accommodate under the PWFA and sex discrimination under Title VII. Through its present Motion for Summary Judgment [29], Legacy seeks dismissal of both claims. King opposes the Motion [29].

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

Before addressing the merits of the claims, the Court will first address an evidentiary issue that King raises in her Response Memorandum [34].

The evidentiary issue surrounds a written transcript of King's audio recording of the termination meeting (i.e. the May meeting). Legacy submitted a written transcript of the discussions that took place at the meeting as an exhibit to its Motion [29]; however, the audio recording was not submitted to the Court. As King points out, the author of the transcript is

unknown. King argues that the same is unauthenticated, constitutes hearsay, and should be stricken from the record pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure. Legacy disagrees and argues to the contrary. Ultimately, the Court need not strike the transcript to make a determination on Legacy's Motion [29]. All persons present at the termination meeting were deposed, and information about what was said at the meeting was elicited from them during their respective depositions. Those deposition transcripts are part of the record, which the Court will primarily consider. Additionally, the Court is unaware of any genuine dispute about what was said during the meeting. Thus, in reality, this appears to be a nonissue at this stage.

Reverting to the merits of the Motion [29], King is pursuing only two claims against Legacy—failure to accommodate and sex discrimination. The Court will address the claims in turn.

## I.       Failure to Accommodate (PWFA claim)

King brings her failure to accommodate claim pursuant to the PWFA—a relatively new federal law "[a]imed at addressing gaps in existing legislation regarding protections for pregnant workers[.]" *Louisiana v. Equal Emp. Opportunity Comm'n*, 705 F. Supp. 3d 643, 649 (W.D. La. 2024). The PWFA is largely modeled after the ADA and "adopts the powers, remedies and procedures of Title VII… as enforcement measures." *Id.*; *see also* 42 U.S.C. § 2000gg-2. Relevant to accommodations for pregnant workers in the workplace, the PWFA provides as follows:

> It shall be an unlawful employment practice for a covered entity to—
>
> (1)  not make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

42 U.S.C. § 2000gg-1(1).

7

To succeed on her failure to accommodate claim under the PWFA, King must establish that "(1) she is a qualified individual; (2) the employer was aware of her limitation; and (3) the employer failed to reasonably accommodate the limitation." *Keiper v. CNN Am., Inc.*, 2024 WL 5119353, at *2 (E.D. Wis. Dec. 16, 2024) (citing 42 U.S.C. § 2000gg-1(1)). In essence, Legacy argues that King cannot establish all elements of her claim. It also raises an undue hardship defense. The Court will address each element of King's claim, beginning with the second element, as well as the parties' arguments relative to undue hardship.

## A. Known Limitation

"Employers only face liability under the PWFA for failure to accommodate their employee's *known* limitations." *Id.* (citing 42 U.S.C. § 2000gg-1(1)) (emphasis in original). Under the PWFA, a "'known limitation' means [a] physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that the employee or employee's representative has communicated to the employer[.]" 42 U.S.C. § 2000gg(4); *see also* 29 C.F.R. § 1636.3(a). The parties do not dispute that King's lifting restriction was related to her pregnancy and therefore a covered physical condition. In other words, Legacy does not contest that King had a limitation as that term is defined under the PWFA. This is critical to the relief Legacy now seeks.

Federal regulations promulgated under the PWFA provide a more detailed definition for the term "limitation," which the Court finds noteworthy. *See* 29 C.F.R. § 1636.3(a)(2). "Limitation" is further defined as:

> [A] physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, of the specific employee in question. "Physical or mental condition" is an impediment or problem that may be modest, minor, and/or episodic. The physical or mental condition may be that an employee affected by pregnancy, childbirth, or related medical conditions *has a need or a problem related to maintaining their health or the health of the pregnancy*. The definition also includes when an employee is

8

> seeking health care related to pregnancy, childbirth, or a related medical condition itself. The physical or mental condition can be a limitation whether or not such condition meets the definition of disability specified in section 3 of the [ADA].

*Id.* (emphasis added).

In its Memorandum [30], Legacy argues that "King failed to adequately and timely communicate [her] restrictions to Legacy's human resources." [30] at p. 9. Importantly, Legacy does *not* contest that King informed Kazanjian (Legacy's HR generalist) that she had restrictions before Legacy made the decision to terminate her. Legacy's argument merely focuses on the *manner* in which King notified Kazanjian that she had restrictions. The Court finds the argument unavailing.

It is undisputed that King emailed Kazanjian on March 20, 2024 to inform her of her pregnancy. The email specifies that King is "… considered to have a high-risk pregnancy at this time" and informs Kazanjian of the existence of a restriction letter provided by King's physician. [33], Ex. 9 at p. 1.[2] Though King did not provide a copy of the February restriction letter as an attachment, the Court finds that the email was sufficient to put Legacy on notice that King had "… a need or a problem related to maintaining … the health of [her] pregnancy." 29 C.F.R. § 1636.3(a)(2). The Court's inquiry could end here but it will nonetheless address Legacy's remaining arguments.

In its Reply [37], Legacy argues that King failed to comply with Legacy's policy "… regarding accommodations for pregnant workers." [37] at p. 6. That policy provides that "[a]n employee or applicant may request an accommodation due to pregnancy… by submitting the request in writing to human resources (HR). The accommodation request should include an

---

[2] Although the Court cites the email attached as an exhibit to King's Response [33], it notes that Legacy submitted a copy of the email in support of its Motion [29]. *See* [29], Ex. 7.

explanation of the pregnancy-related limitations, the accommodation needed and any alternative accommodation(s) that might be reasonable." [37], Ex. 1 at p. 1. Legacy contends that the March email from King to Kazanjian did not provide "… the required explanation of the pregnancy-related limitations." [37] at p. 6 (internal quotation marks omitted). This argument is easily rejected.

In short, Legacy provides no authority, and the Court is not aware of any, indicating that King was *required* to comply with its internal policy to obtain relief under the PWFA. Under the statute, "communicated to the employer," with respect to a known limitation, means:

> [A]n employee or the employee's representative has made the employer aware of the limitation by communicating with a supervisor, a manager, someone who has supervisory authority for the employee or who regularly directs the employee's tasks (or the equivalent for an applicant), human resources personnel, *or* another appropriate official, *or* by following the steps in the covered entity's policy to request an accommodation.

29 C.F.R. § 1636.3(d) (emphasis added).

Again, King's March email to Kazanjian provided Legacy with sufficient notice of her pregnancy limitation and following Legacy's policy was only an alternative way for her to do so. Further, under the PWFA, "[t]he communication may be made orally, in writing, or by another effective means… [It] need not be in writing, be in a specific format, use specific words, or be on a specific form in order for it to be considered 'communicated to the employer.'" *Id.* at § 1636.3(d)(1)-(2). This further supports the Court's finding that the March email provided sufficient notice as there is no requirement in the statute for King to have provided a copy of her initial restriction letter, nor to detail the contents of the letter, as part of her notice to Legacy.

Additionally, it is undisputed that Kazanjian followed up with King via email on May 1, 2024 regarding the restrictions. In that email, Kazanjian asks King whether she "… had any

updates regarding the restrictions." [33], Ex. 8 at p. 1. Again, Legacy does not contest that King

had a limitation as defined by the PWFA. This email demonstrates Kazanjian's knowledge of that

limitation even if it lacked specifics. At the latest, it is undisputed that Legacy was aware of King's

limitation on May 1, 2024 when King replied to Kazanjian and provided the April restriction letter.

The Court is compelled to reiterate the standard applicable to Legacy's Motion [29]. It is

Legacy who "bears the initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of the record which it believes demonstrate the absence of

a genuine issue of material fact." *Nabors*, 2019 WL 2617240 at *1. The Court finds that Legacy

has failed to meet this burden and instead has provided evidence that Legacy was aware of King's

pregnancy-related limitation for purposes of King's PWFA claim.

### B. *Qualified Individual*

Next, the Court turns to the first element of King's claim, which requires her to prove that

she is a qualified employee as defined by the PWFA. *See Keiper*, 2024 WL 5119353 at *2. Relevant

to this element, the term "qualified employee" means:

> [A]n employee or applicant who, with or without reasonable accommodation, can perform the essential functions of the employment position, except that an employee or applicant shall be considered qualified if --
>
> (A) any inability to perform an essential function is for a temporary period;
>
> (B) the essential function could be performed in the near future; and
>
> (C) the inability to perform the essential function can be reasonably accommodated[.]

42 U.S.C. § 2000gg(6)(A)-(C).

11

Legacy argues that King was not qualified to be a case manager due to her lifting restrictions and therefore she cannot establish the first element of her claim. More specifically, Legacy raises two arguments related to this element. First, Legacy argues that King was unable to perform the essential functions of a case manager due to her lifting restrictions. Secondly, it argues that the exception provided in the definition for "qualified employee" does not apply to King because it was unable to *reasonably* accommodate her lifting restrictions. The Court will address these arguments in turn.

i.      *Essential Function*

"Essential functions mean the fundamental job duties of the employment position the employee with a known limitation under the PWFA holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1636.3(g).

The Court first clarifies the essential function of a case manager's job that is at issue. In its Memorandum [30], Legacy argues that "[t]here is no dispute that lifting and maneuvering hospice patients is a required and common duty of an RN employed with Legacy." [30] at p. 12. It contends that from the time King was hired by Legacy in October 2023 "… until February 2024, these duties were required routinely and King performed them without issue until receiving restriction letters." [37] at p. 3. Thus, the essential function at issue is King's ability to lift and maneuver patients while under a 25-pound lifting restriction. Crucially though, Legacy appears to argue that it was an essential function of King's job as a case manager to lift and maneuver patients weighing over 25 pounds *by herself*. It is undisputed that King began to arrange buddy visits with the CNAs after receiving her restriction letters. In its Reply [37], Legacy argues that "[t]he test is not whether [King's] essential job duties were completed by someone else, rather, the test is whether King *herself* could perform the essential functions of her job. The answer to this question is no." [37] at

p. 4 (emphasis in original). Against this backdrop, the Court reverts to the definitions provided in 29 C.F.R. § 1636.3.

Evidence of whether a particular function is essential includes, but is not limited to, the employer's judgment, written job descriptions, and the work experience of past employees in the same job and/or current employees in similar jobs. *See id.* at § 1636.3(g)(2)(i)-(vii). Legacy first points to the job description for case managers.

It is undisputed that a listed "qualification" in Legacy's written job description for case managers includes their ability to "… lift, position and/or transfer patients." [29], Ex. 5 at p. 2. However, the job description is silent on whether a case manager is required to be able to do such tasks *alone*, and it lists no specific amount of weight that case managers are required to lift. On this point, Jones (CPO for Legacy) testified that case managers are required to be able to lift 50 pounds as is standard in the healthcare industry:

> Q.     And so what is the weight requirement that a nurse has to be able to lift to be employed at Legacy?
>
> A.     It would be 50 pounds is the standard that is in healthcare related to nursing for a job.

[33], Ex. 2 at p. 22.

Additionally, Greene, who worked as a case manager before becoming a Branch Administrator at Legacy, testified that she would regularly lift more than 25 pounds in maneuvering patients when she worked as a case manager:

> Q.     When you were -- and I realize this is going back some time. When you were a case manager, did you regularly lift more than 25 pounds?
>
> A.     Yes.
>
> Q.     And what occasions would you lift more than 25 pounds?

13

> A.  Depending on the circumstances, rolling patients, helping move them in the home. If you walked in and they were on the ground, you would have to assist them in getting up.

*Id.*, Ex. 6 at p. 9.

In her Response Memorandum [34], King concedes that these portions of the record "support the lifting requirement to be an essential function[.]" [34] at p. 13. However, she argues that other evidence in the record demonstrates that lifting patients to provide care is "regularly a two-person job, even for non-pregnant employees." *Id.* During her deposition, King acknowledged the possibility of having to lift in excess of 25 pounds when caring for a patient:

> Q.  And do you acknowledge, I think as we all would, there could be instances where in dealing with patients you have to either lift in excess of 25 pounds or exert effort that's equivalent to lifting?
>
> A.  Occasionally, but not all the time.
>
> Q.  But that's certainly a possibility?
>
> A.  Sure.
>
> Q.  When you walk in on any patient, there could be the possibility that you have to do something like that?
>
> A.  Sure.

[33], Ex. 1 at p. 60.

But she later explained that, during the course of her employment with Legacy, she would regularly receive assistance from the family members of patients in providing nursing care:

> Q.  Okay. And you talked about since you started working at Enhabit that -- or excuse me, when you started working at Enhabit when you were still pregnant, that sometimes family members would be there and assist you with wound care?
>
> A.  Of course.
>
> Q.  Did that continue to happen after you had the baby.

> A. All the time.
>
> Q. Did that happen when you were working with Legacy before you were pregnant.
>
> A. Yes.
>
> Q. Family members regularly assisted you with wound care?
>
> A. Yes. Wounds that are on the sacrum or the rectum or the bottom, they are really -- normally really bad, so it takes one person to hold them while the other -- so they don't fall back and forth and another person to do all the care.
>
> Q. So wound care, is it a two-person job?
>
> A. Not always, but it can be.

*Id.* at p. 109-110.

Jessica Griffin, who was hired to fill King's case manager position, corroborated King's testimony that providing wound care could require assistance from another person:

> Q. It's my understanding -- and I want you to correct me if I'm wrong. It's my understanding that you might need help if you're doing wound care?
>
> A. That's correct.
>
> Q. Maybe get a CNA to hold a patient up?
>
> A. That is correct.

*Id.*, Ex. 3 at p. 10.

She then explained that, if she had assistance in providing wound care, she would document the visit accordingly, so that it was not assumed that she did it on her own:

> Q. If a CNA holds a patient while you're doing wound care or something, do you have to code that visit any differently?
>
> A. No, sir. I don't think I code the visit differently. I may chart it a little differently than what I normally would if someone was helping me.

15

Q. Okay. And tell me what [is] the purpose of charting. I think I know, but I've got to have it where I can tell other people, so tell me why you would chart it differently.

A. When you're charting, it's assumed -- I guess an assumption that it's you doing it by yourself. But if you're going to write a narrative, you need to make sure you write detail on what actually happened and who was helping and who wasn't helping. Otherwise, the reader is going to assume that you did it by yourself.

*Id.* at p. 10-11.

Viewing the evidence as a whole in the light most favorable to King, the Court finds that King's testimony describing the need for a second person's assistance in providing wound care, combined with Griffin's testimony confirming the same, is sufficient to create a question of fact as to whether an essential function of King's job as a case manager included the ability to lift and maneuver patients weighing over 25 pounds *by herself*.

In addition, the Court notes that, when asked about the lifting requirement during his deposition, Jones also stated that "[i]f it goes over 50 pounds, there may be situations where we can -- you know, like, a group lift [sic]." [33], Ex. 2 at p. 22. Jones appears to have conceded that there were exceptions to any lifting requirement depending on the amount of weight involved, thereby warranting the need for assistance. Yet, in its Memorandum [30], Legacy argues that King would be unable to lift a fallen patient on her own due to her restrictions—a scenario that seemingly falls under that exception.

In this regard, King points to the portion of her testimony where she stated that no nurse would lift a fallen patient alone "regardless of restrictions" as "[i]t would pose a safety issue for the nurse as well as the patient." *Id.*, Ex. 1 at p. 57. She then elaborated on the standard protocol for case managers in dealing with a fallen patient:

16

Q.    All right. Well, I mean, if you saw a patient in distress and you had to lift them and you were the only one there, what would you do?

A.    I would most likely call for lift assistance, whether that be through the company or EMS volunteers, which is -- should be standard protocol. For example, if a patient had fallen in the floor, you don't know how they fell, you don't know, you know, if they hit their head, did they twist their neck, so you would -- unless the family didn't want you to call EMS, you would need to do that regardless.

*Id.* at p. 58.

During her deposition, Greene explained one occasion that required her to follow that protocol when she worked as a case manager for Legacy:

Q.    Did you ever need assistance in rolling, moving, or assisting someone [in] getting up?

A.    For a six-five 375-pound man that was in the floor, I did have to call lift assist after I got him to a sitting position.

*Id.*, Ex. 6 at p. 9.

In sum, this line of testimony further demonstrates that a question of fact remains as to whether King's essential job functions included the ability to lift patients over her restriction limit without assistance.

And, even assuming that the ability to lift patients weighing over 25 pounds with no assistance was an essential function of King's job as a case manager, the Court's inquiry does not end there. The Court must also consider whether Legacy could have "reasonably accommodated" King's inability to do so. This brings the Court to Legacy's second argument that the relevant exception provided under the PWFA does not apply to King.

17

*ii.     Reasonable Accommodation*

As noted above, an employee may be considered "qualified" for purposes of PWFA if (1) "any inability to perform an essential function is for a temporary period[,]" (2) "the essential function could be performed in the near future[,] and" (3) "the inability to perform the essential function can be reasonably accommodated[.]" 42 U.S.C. § 2000gg(6)(A)-(C). Legacy does not contest the first two prerequisites but argues that it could not reasonably accommodate King's inability to lift patients weighing over 25 pounds without assistance. To be clear, Legacy does not contend that no accommodation existed but only that there was not a reasonable option.

"With respect to an employee or applicant with a known limitation under the PWFA, reasonable accommodation includes… [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified employee with a known limitation under the PWFA to perform the essential functions of that position[.]" 29 C.F.R. § 1636.3(h)(1)(ii). In her Response Memorandum [34], King argues that allowing her to continue to arrange buddy visits with the CNAs was a reasonable accommodation that Legacy could have provided. For its part, Legacy argues that such an arrangement would have been unreasonable because it would have required it to send a CNA with King on every patient visit and therefore it would have to make "… either material and frequent changes to the CNAs' schedules or hir[e] another CNA." [30] at p. 16.

In support of its argument, Legacy relies on an ADA case whose holding it contends is equally applicable to the PWFA. Specifically, it cites *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 698 (5th Cir. 2014), for the proposition that the PWFA, like the ADA, "… does not require [Legacy] to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." [30] at p. 17;

[37] at p. 9. It is true that the PWFA adopts the ADA's definitions for "reasonable accommodation." 42 U.S.C. § 2000gg(7). But, ultimately, whether that interpretation of the ADA applies to the PWFA is of no consequence to the Court's determination on the present issue. As King points out, it is undisputed that she at no point requested for Legacy to hire a CNA to accompany her to every patient visit. Though Legacy contends that such a hire would have been necessary to ensure proper patient care, it is undisputed that King was arranging the buddy visits on an as-needed basis, which only involved the scheduling of *current* CNAs employed by Legacy. King testified as follows relative to the buddy visits she was arranging:

> Q. And I want to separate that from, let's say, the date of the February letter up to the date of the April 17th letter. So while you're under the 35-pound restriction, do you recall ever getting assistance from anyone?
>
> A. We did essentially just buddy visits. Like, I just met with some of the CNAs for our patients that were a little bit more difficult to handle.
>
> Q. So you were already doing those buddy visits after the first letter?
>
> A. On one or two patients maybe that I remember.
>
> Q. And then when you got the 25-pound letter restriction, did you continue that same –
>
> A. Uh-huh (yes).
>
> Q. -- of buddy visits?
>
> A. Yes, sir. It wasn't formal buddy visits. I did not know until the day I was terminated that they were supposed to be formal.
>
> …
>
> Q. Okay. With respect to the buddy visits that you described, was this something that was scheduled with a CNA?

19

A.     The CNAs that I worked with, I would usually just ask if they were going to be going around the same time I was. That way, I could do the wound care with some assistance if we needed it. And we had one patient that was very combative, so I did a buddy visit with the CNA to help her.

[33], Ex. 1 at p. 38-40.

And relevant to this as-needed arrangement is how case managers' and CNAs' work schedules were set. Hisaw, who, again, was a PCC at Legacy during King's tenure, testified that case managers and CNAs at Legacy make their own schedules:

Q.     For scheduling for the case managers to go see patients, can you tell me just briefly how that works? Do you give [sic] the case managers you need to see this patient at this time or do you just give them a list of patients and they go? I realize it's kind of a difficult question.

A.     Very broad. So typically case managers have their area that they see patients. Not saying that they would never have to travel. But, say, a nurse has Columbus and West Point patients, so we get new admissions in Columbus and West Point, they're going to go to that nurse versus someone who lives in Eupora or someone who lives -- that's kind of based off of where they get their patients is what area they're covering. It's based off of the patient's acuity, how often they're seen each week. We're also 24/7 on call, so just because someone might be seen two times a week, someone might be seen every day. Someone might be seen once a week. It is up to the nurse. They can schedule what days they're going to see them and the time.

Q.     Okay. Do the PCCs tell the nurses, you know, this patient needs to be seen every day or two times a week?

A.     No.

Q.     Does the nurse make that decision?

A.     Yes.

Q.     Okay. So, I mean, is it fair to say the nurse kind of makes their own schedule?

20

A.    Yes.

Q.    Are the CNAs the same way?

A.    Yes.

Q.    So both the nurses and the CNAs –

A.    Hang on. Let me go back on that. The CNAs do make their own schedule, but the case manager schedules out how often the CNA sees them.

Q.    So the nurse makes her own schedule and tells the CNA how many times to see a patient?

A.    Puts the order – puts the order in for how often they're going to be seen. Now, if it's three times a week, the CNA can typically work with the patient on what days those are. They don't give them specific dates that – or days that they have to see them.

*Id.*, Ex. 4 at p. 30-31.

In the Court's view, this testimony undercuts Legacy's argument that allowing King to continue to arrange as-needed buddy visits would have been a material alteration to CNAs' schedules. The Court finds that, based on this testimony, a reasonable jury could find that as-needed buddy visits were a reasonable accommodation given the case manager and CNAs' flexibility in setting their own schedules. *See McCoy v. Texas Dep't of Crim. Just.*, 2006 WL 2331055, at *9 (S.D. Tex. Aug. 9, 2006) (explaining that under the ADA "the reasonableness of an accommodation is generally a question of fact inappropriate for resolution on summary judgment.") (collecting cases).[3]

---

[3] The Court is cognizant of Legacy's contention that an "as-needed" arrangement would be insufficient to ensure proper patient care because of alleged risks associated with allowing King to see patients alone while under lifting restrictions. As explained above, questions of fact remain as to whether King was required to lift or maneuver patients over her restriction limit without assistance. Thus, even considering this argument, the outcome remains unchanged for those same reasons.

The Court now addresses Legacy's argument that alterations to CNA schedules would cause it undue hardship.[4] "[A]n employer seeking summary judgment on that ground has the heavy burden of establishing that every reasonable jury would find that the requested accommodation would pose an undue hardship." *Picard v. St. Tammany Par. Hosp.*, 611 F. Supp. 2d 608, 622 (E.D. La. 2009). Undue hardship means "an action requiring significant difficulty or expense, when considered in light of factors…" set forth in the PWFA. 42 U.S.C § 12111(10)(A); 29 C.F.R. § 1636.3(j)(1). No one factor is dispositive and includes:

> (i) The nature and net cost of the accommodation needed under the PWFA;
>
> (ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;
>
> (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type, and location of its facilities;
>
> (iv) The type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and
>
> (v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

---

[4] In her Response Memorandum [34], King argues that Legacy has waived its undue hardship defense because it failed to raise arguments in that regard in its Memorandum [30] and only mentioned undue hardship in a footnote. Though Legacy does not provide extensive argument, it *does* raise the defense in the body of its initial brief. *See* [30] at p. 18-19. The Court finds that this was sufficient to place King on notice of the issue allowing her the opportunity to respond to the same, which she has done in her Response Memorandum [34]. *See* [34] at p. 20. Accordingly, the Court will consider the parties' arguments relative to undue hardship.

29 C.F.R. § 1636.3(j)(2)(i)-(v).[5]

Legacy argues that allowing King to continue arranging the buddy visits with the CNAs would "… fundamentally change how Legacy operates as a business[,]" and would require it to "… disrupt the schedules of its CNAs who have their own patients and responsibilities to ensure that a CNA was constantly available to accompany King[.]" [37] at p. 9. It does not address the first three factors listed above; however, it does appear to contend that changing the CNAs' work schedules would have some impact on the CNAs' ability to perform their respective duties. Of importance, Legacy does not elaborate as to what that impact is though.

Similarly, Legacy does not contend that arranged buddy visits with current CNAs impact the facilities' ability to provide effective hospice care other than arguing that an "as-needed" arrangement is not feasible, which the Court has addressed above. In its Reply [37], Legacy reiterates many of its arguments related to the *reasonableness* of the buddy visits in an attempt to prove its undue hardship defense. In the Court's view, Legacy has failed to meet its "heavy burden" of proving the defense at this stage. *Picard*, 611 F. Supp. 2d at 622.

Notwithstanding the above, Jones, who, again, was one of the decisionmakers in King's termination, testified that he did not fully consider the "ramifications" of continuing the buddy visits when the termination decision was made:

> Q.     And why can you not accommodate that? Like, what [King] was doing where she was scheduling her visits to coincide with the CNA's visits, why is that not reasonable?
>
> A.     Because -- I thought I gave you an example a few minutes ago. I apologize. So a CNA has to go see three patients, and sometimes those visits may take up to two hours. Whereas, an RN may be 45 minutes and needs to see five patients that day. Like, each of them have completely different patients they have to go see on different rotations, so we can't -- like,

---

[5] This list of factors provided in 29 C.F.R. § 1636.3(j)(2) mirror those considered under the ADA's definition of undue hardship. *See* 42 U.S.C § 12111(10)(B).

when they work two individually different jobs, asking them to stop what they're doing in one and go make it work was not something that was reported to the BA, the branch administrator, and was not the best situation.

Q. I understand that it wasn't reported, but, I mean, Clay, I think it's pretty undisputed that it was working.

…

I mean, like you had no complaints from any --

A. Well --

Q. You had no complaints from any CNAs, did you?

A. … So again, like, the perspective of the CNA that works in the field or Taylor King as an RN case manager, is not the perspective of the organization or the branch administrator, you know. Marina mentioned just a few minutes ago that she asked Railey, Can you accommodate this? And she said, No, I can't. You know, I don't know that the visits that were recorded didn't cause overtime for that individual. I don't know the ramifications of it fully because I didn't investigate that because that was not a factor at the time of termination.

Q. Right. Why didn't you --

A. So I didn't make it a fact of this case.

[33], Ex. 2 at p. 24-26.

Additionally, this testimony supports that Jones relied on Kazanjian and Greene's assessments of the accommodation at issue. For her part, Kazanjian testified that she was not aware of any occurrence where a patient was not seen or not seen in a timely manner as a result of King's buddy visit arrangements. *See id.*, Ex. 5 at p. 15. When asked whether rearranging the CNAs' schedules harmed patient care in any way, Greene testified that "nothing was brought to [her] knowledge about it." *Id.*, Ex. 6 at p. 20. She also testified that she received no complaints from the CNAs who attended the visits with King. *See id.* at p. 18. Relatedly, Williams testified

24

that assisting King during the buddy visits arranged with her did not interfere with her ability to perform her CNA duties:

> Q.    Did helping [King], did it cause you to spend more time at the patient's house than you normally would?
>
> A.    Not really. Not really.
>
> Q.    Did helping Taylor interfere with your ability to do what you needed to do?
>
> A.    Unh-unh (no). It didn't bother me at all. I didn't mind helping her.

[33], Ex. 7 at p. 8.

Ultimately, viewing this evidence in light most favorable to King, the Court alternatively finds that a question of fact exists as to whether Legacy's ability to provide hospice care would be impacted by its allowance of buddy visits with current CNA employees.

### C. Failure to Reasonably Accommodate the Limitation

The third element of King's PWFA claim requires her to prove that Legacy "failed to reasonably accommodate [her] limitation." *Keiper*, 2024 WL 5119353 at *2. The Court need not extensively address this element. As noted above, questions of material fact remain as to whether Legacy could have reasonably accommodated King's limitation. Nonetheless, this element focuses on the employer's failure to provide such accommodation. It is undisputed that Legacy did not provide *any* accommodation to King after learning of her pregnancy limitation, much less a reasonable one.

Overall, having found that questions of material fact remain for a jury to decide regarding King's PWFA claim, the Court finds that summary judgment on this claim is not appropriate.

25

*II.      Title VII Sex Discrimination*

King also brings a sex discrimination claim under Title VII. In pertinent part, Title VII provides that:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

"The [Pregnancy Discrimination Act] amended and expanded Title VII's definition of the terms 'because of sex' and 'on the basis of sex' to include 'because of or on the basis of pregnancy, childbirth, or related medical conditions[.]'" *Shelton v. Parkland Health*, 2025 WL 1513441, at *11 (N.D. Tex. May 28, 2025) (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 226, 135 S. Ct. 1338, 191 L. Ed. 2d 279 (2015)). "An employee may rely on direct or circumstantial evidence to establish a prima facie case of discrimination under Title VII." *Arredondo v. Schlumberger Ltd.*, 583 F. Supp. 3d 783, 800 (W.D. Tex. 2022) (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007)).

King relies on circumstantial evidence to establish her sex discrimination claim. *See* [25] at p. 25-26.[6] Thus, the familiar burden-shifting framework set forth in *McDonnell Douglas* applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

---

[6] The Court is compelled to point out that, in her Response Memorandum [34], King cites two out-of-circuit cases involving direct evidence of discrimination, namely *Wagner v. Dillard Dep't Stores, Inc.*, 17 F. App'x 141 (4th Cir. 2001) and *E.E.O.C. v. Corinth, Inc.*, 824 F. Supp. 1302 (N.D. Ind. 1993). Although she does not appear to argue that there is direct evidence of discrimination in this case, the Court will nonetheless address it briefly out of an abundance of caution. "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Jones v. Nima Goharkhay PLLC*, 2026 WL 84561, at *7 (S.D. Tex. Jan. 12, 2026) (quoting *Portis v. First National Bank of New Albany, Mississippi*, 34 F.3d 325, 329 (5th Cir. 1994)) (internal quotation marks omitted). In briefly arguing that evidence of discrimination exists, King points to two comments made by Kazanjian during the

26

Under the *McDonnell Douglas* framework, the burden is first on the plaintiff to create a presumption of sex discrimination by establishing a prima facie case. *Id*. at 802, 93 S. Ct. 1817. If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id*. "The burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). If the defendant articulates a legitimate, nondiscriminatory reason, then the ultimate burden rests on the plaintiff to prove the employment decision was the result of a discriminatory practice. *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. 1817.

*A. Prima Facie Case*

To establish a prima facie case of sex discrimination, King must show that "(1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside her protected class, or similarly situated employees outside the protected class were treated more favorably under nearly identical circumstances." *Arredondo*, 583 F. Supp. 3d at 801 (citing *Earle v. Aramark Corp.*, 247 F. App'x 519, 523 (5th Cir. 2007)).

---

termination meeting and one comment made by Jones during his deposition. "A statement may constitute direct evidence of pregnancy discrimination if it is: (1) pregnancy related; (2) close in time to the adverse employment action; (3) made by someone with authority over the adverse employment action; and (4) related to the adverse employment action." *Id*. (citing *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 608 (5th Cir. 2007)). King does not address any of these factors. Irrespectively, the Court finds that none of the comments she has identified relate to Legacy's decision to terminate her, "nor [do they] resemble the type of direct statements courts within the Fifth Circuit have found to be direct evidence of pregnancy discrimination." *Id*. (citing *Sims v. Am.'s Fam. Dental LLP*, 2017 WL 1397854, at *5 (S.D. Tex. Apr. 19, 2017) (finding supervisor's repeated remarks that "he was going to fire [plaintiff] because she was pregnant" were clearly direct evidence of pregnancy discrimination); *Martin v. Winn-Dixie Louisiana, Inc.*, 132 F. Supp. 3d 794, 818 (M.D. La. 2015) (supervisor's statement that plaintiff "couldn't do her job as Co-Director and be pregnant" was direct evidence of pregnancy discrimination).

27

Legacy argues that King cannot satisfy all elements of her prima facie case—particularly, the second and fourth elements. First, it argues that King was not qualified to be a case manager. The Court notes that the parties' arguments regarding whether King was qualified to be a case manager substantially overlap with those raised in connection with the PWFA claim. The Court need not revisit those arguments because King's Title VII claim fails on an alternative basis for the reasons explained *infra* concerning the fourth element.

In its Memorandum [30], Legacy argues there is no evidence of disparate treatment of employees outside of King's protected class nor that King was replaced by someone outside of her protected class. In response, King fails to argue that she was replaced by a nonpregnant woman. *See Gerdin v. CEVA Freight, L.L.C.*, 908 F. Supp. 2d 821, 827 (S.D. Tex. 2012) (citing *McLaughlin v. W & T Offshore, Inc.*, 78 Fed. Appx. 334, 338 (5th Cir. 2003); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1060 (5th Cir. 1998)) (explaining that women who are not pregnant are nonmembers of the protected class of pregnant women). While it is undisputed that King was replaced by Griffin, there is no evidence in the record that establishes Griffin's pregnancy status at the time she was hired by Legacy. Again, King provides no argument to the contrary and fails to direct the Court's attention to any evidence establishing otherwise.[7]

Similarly, King fails to present any comparator evidence to support a disparate treatment claim. In her Response Memorandum [34], King argues that, had she not been pregnant, then her treatment would have been different. *See* [34] at p. 28. As to the treatment she is referring to, King further states that "Kazanjian acknowledged that all nurses needed help maneuvering patients, but the decision to terminate [her] was based on her pregnancy-related restrictions." *Id*. Nonetheless,

---

[7] The Court notes that Legacy identified Griffin as King's replacement in its written discovery responses and stated that it had "no knowledge of Ms. Griffin's pregnancy status at the time of hire." [33], Ex. 11 at p. 5. Griffin was never asked about her pregnancy status during her deposition, and King has provided no evidence that this information was elicited from any other deponent in this case.

King provides no specific evidence of *nonpregnant* employees who remained employed with Legacy while under medical lifting restrictions. Again, to succeed under Title VII, King must at minimum "proffer[] comparators who allegedly drew dissimilar employment decisions" under "nearly identical" circumstances. *Arredondo*, 583 F. Supp. 3d at 801; *see also Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (affirming summary judgment on plaintiff's pregnancy discrimination claim after she was discharged due to pregnancy-related absenteeism and holding that "unless the absences of nonpregnant employees are overlooked" there was no evidence of disparate treatment). "The 'similarly situated' prong requires a Title VII claimant to identify *at least one coworker outside of [her] protected class* who was treated more favorably 'under nearly identical circumstances.'" *Forbis v. Exeter Fin., L.L.C.*, 2022 WL 17986689, at *4 (5th Cir. Dec. 29, 2022) (quoting *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017)) (emphasis added). King has failed to do so in this case and does not argue that any exist. *See Arredondo*, 583 F. Supp. 3d at 801 (granting summary judgment on disparate treatment sex discrimination claim where plaintiff failed to establish prima facie case in not "point[ing] to a 'similarly situated' employee, much less identify[ing] how any employee, in nearly identical circumstances, was treated more favorably than she."). Simply put, due to the deficiencies the Court has identified, it deems that King abandoned her opposition to Legacy's request for dismissal on the basis that the fourth element of her prima facie case is not met. *See McMahan v. U.S. Bank Nat'l Ass'n*, 2024 WL 2243301, at *17 (S.D. Tex. Apr. 11, 2024) (explaining that an argument that is not sufficiently briefed is waived). Resultantly, her Title VII sex discrimination claim is due to be dismissed.

*Conclusion*[8]

For the reasons set forth above, Legacy's Motion for Summary Judgment [29] is GRANTED IN PART AND DENIED IN PART. King will be permitted to proceed to trial against Legacy on her failure to accommodate claim under the PWFA. Her Title VII claim is hereby DISMISSED *with prejudice*.

SO ORDERED, this the 24th day of March, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE

---

[8] To the extent the Court has not specifically addressed the parties' remaining arguments, it has considered them and determined that they would not alter the result.